## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ESTATE OF KHALIL FARHAT**, *et al.* | |
| *Plaintiffs,* | |
| **v.** | **Case No. 19-cv-03631-RCL** |
| **THE ISLAMIC REPUBLIC OF IRAN**, *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

Four decades ago, the United States Marine Corps barracks in Beirut, Lebanon, was blown to pieces by a suicide bomber. At the time, it was among the largest non-nuclear explosions ever detonated on the face of the Earth. Hundreds were slaughtered in that act of terror. Many more were injured. Among the victims were Khalil Farhat, an elderly kiosk owner at the barracks who was killed in the blast, and Hisham Jaber, a liaison officer to the U.S. Multi-National Force ("MNF") who sustained injuries in the search and rescue efforts that followed. Mr. Farhat and Mr. Jaber, both Lebanese nationals, were working for the U.S. government during the attack. The Estate of Mr. Farhat, Mr. Jaber, and their families now bring suit. They argue, like many plaintiffs before them, that the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are liable for damages from the attack because Iran and MOIS provided material support to Hezbollah—the terror organization that executed the bombing.

Plaintiffs rely on causes of action stemming from provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605A(c), as well as District of Columbia law, or alternatively, Lebanese law. Plaintiffs have moved for a default judgment as to liability. For the reasons outlined below, the Court will grant the plaintiffs' motion.

1

## I.  PROCEDURAL HISTORY

The Estate of Mr. Farhat and his family members initiated this suit against Iran and MOIS on December 5, 2019. Compl., ECF No. 1. A few months later, plaintiffs amended their complaint and added more family members of Mr. Farhat, as well as Mr. Jaber and his family members. *See* Am. Compl., ECF No. 7. In that Amended Complaint, both jurisdiction and liability were premised on 28 U.S.C. § 1605A, which provides a private right of action to eligible victims of state-sponsored terrorism. Am. Compl. ¶ 8.

When other methods failed, service on defendants was made via diplomatic channels, as authorized by 28 U.S.C. § 1608(a)(4). ECF Nos. 14, 15. Still, defendants ignored this suit. Thus, upon motion by plaintiffs, the Clerk of this Court entered default against the defendants. ECF No. 21. Plaintiffs filed their first motion for default judgment on liability nearly two years ago. Pls.' Mot., ECF No. 24. The Court denied that motion without prejudice. Order, ECF No. 25. In its Order, the Court explained that the Estate of Mr. Farhat and Mr. Jaber may be able to assert claims under 28 U.S.C. § 1605A(c), but that their family members could not. Order 1. Instead, because they do not meet § 1605A(c)'s requirements, the family member plaintiffs may pursue claims only under applicable state or foreign law. *See Est. of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 18–20 (D.D.C. 2011). The Court then granted plaintiffs leave to supplement and refile their motion to address this issue. Order 2.

Plaintiffs have now filed a second, supplemental motion for default judgment as to liability—in which they argue that this Court should apply District of Columbia law to the family member plaintiffs' claims. Pls.' Suppl. Mot., ECF No. 28. Thus, the Court must, once again, evaluate whether all plaintiffs have met the prerequisites for a default judgment as to liability. The Court's analysis begins with findings of fact and proceeds to conclusions of law.

## II.   FINDINGS OF FACT

To obtain a default judgment, plaintiffs must first establish their claim or right to relief by "evidence satisfactory to the court." *See* 28 U.S.C. § 1608(e). To assess whether plaintiffs have met that burden, a court shall consider evidence and make findings of fact. In doing so, a court may not "simply accept a complaint's unsupported allegations as true." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp 2d 163, 171 (D.D.C. 2010). Instead, a court is obligated "to inquire further before entering judgment against parties in default." *Id.* (internal quotations omitted).

In FSIA cases, courts look to a variety of evidentiary sources to satisfy their statutory obligation. For example, courts may rely upon plaintiffs' "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (Lamberth, C.J.) (alteration in original) (quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)). A court may also "take judicial notice of related proceedings and records in cases before the same court." *See, e.g.*, *Rimkus*, 750 F. Supp 2d at 171 (internal quotations omitted). Plaintiffs here rely predominantly on proceedings and records in one of this Court's prior cases in support of their motion for default judgment. *See* Pls.' Mot. at 1.

### A.  Judicial Notice

Plaintiffs request that the Court take judicial notice of and adopt all of the findings of fact and conclusions of law in its order granting a default judgment as to liability in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) (Lamberth, J.). *See* Pls.' Mot. at 1. In *Peterson*, this Court presided over a two-day bench trial where it "reviewed the extensive evidence presented during that trial by both lay and expert witnesses regarding the bombing and defendants' actions relating to it." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 320 (D.D.C. 2014) (internal

quotations omitted) (quoting *Peterson*, 664 F. Supp. 2d at 48) (Lamberth, J.)). The Court then held Iran and MOIS liable for the barracks bombing. *Peterson*, 664 F. Supp. 2d at 65.

Under Federal Rule of Evidence 201(b), courts may take judicial notice of facts "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In FSIA cases, courts frequently take judicial notice of other proceedings "involving the same conduct by the same defendants." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018). This is true "even when those proceedings have taken place in front of a different judge." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). Judicial notice is particularly sensible where, as here, the Court assesses new claims from an old attack with facts well established in several other cases.

Still, this Court has explained before that "[t]he taking of judicial notice of the *Peterson* opinion . . . does not conclusively establish the facts found in *Peterson* for, or the liability of the defendants in [other] cases." *Valore*, 700 F. Supp. 2d at 60. This remains true. In the ordinary course, mere citation to another case is hardly sufficient to warrant a finding of liability. However, "the FSIA does not require this Court to relitigate issues that have already been settled." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009). And make no mistake, the responsibility of Iran and MOIS for the attack on the Marine barracks has been well settled, not just in *Peterson*, but in the many other FSIA cases arising from the same act of terror.[1] Thus, the Court will grant plaintiffs' motion for judicial notice. *See* Pls.' Mot. at 1.

Even so, the Court will not simply "adopt previous factual findings without scrutiny." *Worley*, 75 F. Supp. 3d at 319. Instead, the Court will use judicial notice of evidence in earlier

---

[1] *See, e.g.*, Pls.' Suppl. Mot. at 2–3 (listing "at least 20 other cases that have come before this Court arising out of the October 23, 1983 attack").

cases to "reach [its] own independent findings of fact."[2] *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010). So, the Court has once again scrutinized its factual findings in prior cases and revisited the horrors of that day.[3] The Court need not dwell on every detail of this decades-old detonation. Instead, the Court will simply lay out facts that suffice to establish Iran and MOIS's responsibility for this terror attack.

### B. The United States' Presence in Lebanon

The late 1970s and 1980s in Lebanon consisted of political instability and civil war. *See Peterson*, 264 F. Supp. 2d at 49. That bloody infighting would eventually lead to tens of thousands of deaths in Lebanon. *Id.* To mitigate the chaos, and with the concurrence of the United Nations, a multinational coalition consisting of American, British, French, and Italian servicemembers commenced a peacekeeping mission with the purpose of promoting stability in the region. *Id.* This coalition arrived in the Lebanese capital of Beirut in 1982. *Id.* The 24th Marine Amphibious Unit of the U.S. Marines ("the 24th MAU") joined the coalition the following summer. *Id.*

Despite being members of the armed forces, these servicemembers possessed neither combatant nor police powers while they were stationed in Beirut. *Id.* Instead, under the then-operative rules of engagement, they were not permitted to carry weapons with live rounds in their chambers, were instructed to use only the minimum degree of force to accomplish any mission,

---

[2] When the facts of an FSIA case mirror those in previous cases the court presided over, little is gained from requiring the court to, once again, regurgitate the narrative. Instead, a court may reach independent findings of fact with judicial economy in mind. *See, e.g., The Estate of Terry Hudson v. Islamic Republic of Iran*, No. 19-cv-377 (RCL), (D.D.C. Dec. 9, 2021) (taking efficient judicial notice of cases arising out of the Marine barracks bombing). Thus, the Court's summary of events here is more than enough.

[3] Though plaintiffs only explicitly requested that the Court take judicial notice of the proceedings in *Peterson*, Pls.' Mot. at 1, the Court is permitted under the Federal Rules of Evidence to take judicial notice on its own initiative. Fed. R. Evid. 201(c). Thus, the Court also takes judicial notice of other cases arising from the same 1983 Beirut barracks bombing, as the facts found in each of these cases collectively satisfy the Court as to defendants' liability. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) (Lamberth, C.J.); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311 (D.D.C. 2014); *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68 (D.D.C. 2010); *Ayres v. Islamic Republic of Iran*, No. 18-cv-265 (RCL), 2022 WL 1438605 (D.D.C. May 3, 2022).

and were commanded to protect innocent civilians from harm. *Id.* at 50 n.4. In this way "the members of the 24th MAU were more restricted in their use of force than an ordinary U.S. citizen walking down a street in Washington, D.C." *Id.* at 50. The peacekeeping function of the servicemembers at the barracks is further underscored by the testimony of Col. Timothy J. Geraghty, the Commander of the 24th MAU, who testified to this Court:

> [E]ssentially . . . it was primarily a peacekeeping mission and it was to show [our] presence, and when I say ours, and this is throughout all the forces, is that we were out showing a presence, [primarily] to provide stability to the area. And I might add that there's no doubt in just about anyone involved at the time, we saved a lot of lives by our presence there for awhile. And that was part of, I might add, in my judgment, the success of that, our presence mission there, and [that] it was working is the primary reason why we were targeted . . . .

*Id.* And the U.S. and other foreign forces were not alone in Beirut. The 24th MAU worked with the Lebanese Armed Forces using Lebanese Army liaison officers as "the primary intercommunication" between the two groups. *Peterson* Trial Tr. 03/17/03 AM 33:16–19 (Col. Timothy J. Geraghty). Some civilians and vendors were also granted limited access to the U.S. Marines compound. Jacobs Aff. ¶ 10, ECF No. 24-5; *see* Reed Aff. ¶ 11, ECF No. 24-6. Together these groups worked towards promoting peace in the region.

### C. Iran and the Origins of Hezbollah

Iran was not always an "Islamic Republic." Rather, it became one after the 1979 revolution replaced the government of the Shah with that of Ayatollah Ruhollah Khomeini. *Peterson*, 264 F. Supp. 2d at 50. On the heels of that regime change, the post-revolutionary government of Iran drafted a constitution—still in effect today—announcing its new identity as an Islamic theocracy and declaring its commitment to spreading the goals of its revolution to other nations. *Id.* at 50–51. With that aim, between 1983 and 1988, the Iranian government spent approximately $50 to $150 million bankrolling terrorist activity in the Near East. *Id.* Among the batch of terrorist

6

organizations Iran financed was Hezbollah, an extremist group formed in the war-torn republic of Lebanon. *Id.* at 51.

The Iranian government spawned and sponsored Hezbollah. *Id.* at 53 ("It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran."). Indeed, Hezbollah operated as a tool of the Iranian government with its objective "to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran." *Id.* at 51. During the *Peterson* trial, several experts testified to Iran's culpability for the formation and operation of Hezbollah. Dr. Patrick Clawson, a widely renowned expert on Iranian affairs, confirmed Iran's control over Hezbollah around 1983 stating that "both Iranian and Lebanese observers have described it as being established at Iran's orders and as being a creature of Iran when it began." *Id.* Dr. Reuven Paz, an expert on Islamist terror groups, corroborated this testimony stating that at that time Hezbollah "was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon." *Id.* at 52. Iran effectuated this control through the MOIS, which served as "[t]he primary agency through which the Iranian government both established and exercised operational control over Hezbollah." *Id.* at 53.

**D. The Barracks Bombing**

On October 23, 1983, on a Sunday morning, Hezbollah militants carried out a scheme that would end with hundreds dead at the Marine barracks in Beirut. First, Hezbollah militants ambushed a delivery truck that routinely brought water to the Beirut International Airport—located near the barracks. *Id.* at 56. By that point, the terrorists had already constructed and painted a replica delivery truck. *Id.* However, instead of water, the sham truck was filled with explosives. Shortly after the ambush, the terrorists swapped the real truck for their bogus one, which was then driven by an Iranian member of Hezbollah towards the barracks. This elaborate ruse enabled the

terrorists to carry on their mission without raising suspicion until it was too late. *See Worley*, 75

F. Supp. 3d at 321. This Court has described what happened next:

> At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks. As the truck circled in the large parking lot behind the barracks, it increased its speed. The truck crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks. When the truck reached the center of the barracks, the bomb in the truck detonated.
>
> The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth. The force of its impact ripped locked doors from their doorjambs at the nearest building, which was 256 feet away. Trees located 370 feet away were shredded and completely exfoliated. At the traffic control tower of the Beirut International Airport, over half a mile away, all of the windows shattered. The support columns of the Marine barracks, which were made of reinforced concrete, were stretched, as an expert witness described, "like rubber bands." The explosion created a crater in the earth over eight feet deep. The four-story Marine barracks was reduced to fifteen feet of rubble.

*Peterson*, 264 F. Supp. 2d at 56. The explosion killed 241 servicemembers and left many others

mangled, burned, broken, lacerated, and in severe pain. *Anderson*, 753 F. Supp. 2d at 77. A search,

rescue, and recovery effort began immediately after the attack and lasted days. *See* Jaber Aff. ¶ 8,

ECF No. 24-2; *Ayres v. Islamic Republic of Iran*, No. 18-cv-265 (RCL), 2022 WL 1438605, at *3

(D.D.C. May 3, 2022). The brave individuals who assisted in that operation were met with an

utterly nightmarish scene:

> In the immediate aftermath of the explosion, those who could "ran to the rubble and started searching for survivors among the loose hands, heads, legs, arms, and torsos that littered the ruble-strewn ground." ERIC M. HAMMEL, THE ROOT: THE MARINES IN BEIRUT, AUGUST 1982–FEBRUARY 1984, at 330 (1985). In the remains of the barracks, "[h]uge blocks of steel-laced concrete angled in all directions" where "twisted corpses dangled from the cracks." *Id.* at 352. Many of those who survived "had shredded skin adhering to their lower legs and feet . . . caused by the force of the blast." *Id.* at 351.

*Valore*, 700 F. Supp. 2d at 64. Predictably, several of those who assisted in the search, rescue, and

recovery effort suffered both physical and emotional injuries. *See, e.g.*, *Ayres*, 2022 WL 1438605,

at *1 (awarding damages to servicemen injured in the search and rescue effort).

The Court remains horrified by the gruesome brutality of the attack. Indeed, four decades later, the Court is still presiding over cases concerned not merely with the physical damage of the bombing, but also with the lingering psychological and emotional trauma of survivors and family members.

### E. Evidence of Iranian Responsibility

Several of this Court's cases are replete with evidence of defendants' responsibility for this attack and others. *See* discussion *supra* Part II.A. Three sources of evidence most simply satisfy this Court that Iran and MOIS orchestrated the attack on the barracks: (1) expert testimony on the origin and operation of Hezbollah, (2) forensic explosives analysis, and (3) military intelligence.

The formation and operation of Hezbollah, as well as its limited capacity to act independently, support this Court's conclusion that Iran and MOIS were behind the attack. As explained above, Iran is responsible for the creation and direction of Hezbollah. *See* discussion *supra* Part II.C. Further, the sophistication and scale of the attack on the Marine barracks was beyond the sole capacity of Hezbollah and highly suggestive of Iranian involvement. *See Peterson*, 264 F. Supp. 2d at 52. Indeed, when asked about Hezbollah's ability to unilaterally plan and carry out the attack on the barracks in *Peterson*, Dr. Paz testified "I don't think they could have carried out such an attack without Iranian training, without Iranian—Iranian supply of the explosives even, and without directions from the Iranian forces in Lebanon itself." *Id.*

Forensic evidence of the explosive material used in the blast further proves Iran and MOIS's responsibility for the attack. While the force of the explosion was equivalent to approximately 15,000 to 21,000 pounds of TNT, the actual explosive material employed by the terrorists was "bulk form" pentaerythritol tetranitrate, or PETN. *Id.* at 56. Bulk form PETN, is manufactured in specialized factories and is used for military purposes and is distinct from standard commercially available PETN. *Id.* at 57. Critically, at the time of the barracks attack, bulk

form PETN was not manufactured in Lebanon; it was, however, manufactured within the borders of Iran. *Id.*

Finally, as if all that were not enough, information obtained via military intelligence all but conclusively establishes that the attack on the barracks was directed by Iran and MOIS. *Id.* at 54. In *Peterson*, Admiral James A. Lyons, Deputy Chief of Naval Operations for Plans, Policy and Operation from 1983–85, testified about an intercepted message between MOIS and the Iranian ambassador to Syria. *Id.* Dr. Michael Ledeen—foreign relations expert and consultant to the U.S. Defense Department at the time of the attack—also testified about the intercept saying it was "one of the most impressive works of intelligence analysis that [he] saw [about the bombing], and it was absolutely convincing." *Id.* at 54 n.13. That intercepted message showed MOIS ordering the ambassador to coordinate attacks against the MNF peacekeeping coalition in Lebanon. *Id.* at 54

And the Iranian ambassador followed the order. *Id.* at 54–56. Testimony from none other than a member of Hezbollah confirms as much. In *Peterson*, the Court heard the videotaped testimony of a Hezbollah member confirming that the Iranian ambassador commanded a leader of the Lebanese headquarters of the Iranian Revolutionary Guard ("IRG") to instigate the attacks. *Id.* Following those orders, that IRG leader later met with leaders of Hezbollah and planned the attack. Put plainly, the message intercept is a smoking gun. It shows that Iran and MOIS instigated and coordinated the terrorist attack on the barracks.

Collectively, these facts provide the Court with overwhelming evidence that Iran and MOIS puppeteered Hezbollah in the suicide bombing of the Marine barracks.

### III.   CONCLUSIONS OF LAW

#### A. Subject Matter Jurisdiction

Before it can assess the merits of plaintiffs' case, this Court must have jurisdiction to entertain plaintiffs' claims. *See, e.g., Cornish v. Dudas*, 715 F. Supp. 2d 56, 60 (D.D.C. 2010). Further, it is plaintiffs' burden to demonstrate subject matter jurisdiction. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). In cases such as this, a patchwork of provisions of the FSIA and related statutes set forth the criteria for the Court's exercise of subject matter jurisdiction. Those criteria may be distilled into three broad categories: (1) grant of original jurisdiction, (2) waiver of sovereign immunity, and (3) the statutory requirements for a claim to be heard. Before assessing liability, the Court must satisfy itself of each of these subject-matter jurisdictional requisites.

#### 1.   Grant of Original Jurisdiction

The FSIA grants United States district courts "original jurisdiction without regard to amount in controversy of any [(1)] nonjury civil action [(2)] against a foreign state . . . [(3)] as to any claim for relief in personam [(4)] with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). The FSIA further defines a foreign state to include any "political subdivision" or "agency or instrumentality" thereof. 28 U.S.C. § 1603(a).

First, plaintiffs have not sought a jury trial, nor are they entitled to one under the Seventh Amendment, as this is a case under the FSIA. Am. Compl. at 14–15; *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002) ("[C]laims under the FSIA are not eligible for resolution by a jury . . . ."). Thus, this is a nonjury civil action.

Second, plaintiffs have sued Iran and MOIS, both of which are considered a foreign state. Am. Compl. ¶ 2. Iran, of course, is the foreign state itself. "MOIS is considered to be a division of [the] state of Iran, and is treated as a member of the state of Iran itself." *Bennett v. Islamic Republic*

11

*of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007) (Lamberth, J.) (first citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); then citing *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005)). MOIS is clearly a political subdivision of Iran. Thus, this action is against a foreign state as defined by the FSIA.

Third, this lawsuit is against Iran and the MOIS in personam, not against their property. *Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("In personam jurisdiction is jurisdiction over the defendant. In rem jurisdiction is jurisdiction over the property."). Thus, this is an action in personam, rather than in rem.

Fourth and finally, as discussed in the following subsection, Iran and MOIS are not entitled to immunity from this suit. Accordingly, because this is a nonjury civil action against a foreign state for relief in personam to which the defendants are not immune, the Court has original jurisdiction over these cases.

### 2. Waiver of Sovereign Immunity

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Since federal courts must consider issues of subject matter jurisdiction *sua sponte, Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), a district court adjudicating FSIA claims must decide whether an exception to immunity applies "even if the foreign state does not enter an appearance," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 & n.20 (1983). Among the several exceptions to foreign sovereign immunity is the FSIA's terrorism exception, which states that a foreign state has no immunity:

> in any case . . . in which [1] money damages are sought [2] against a foreign state [3] for personal injury or death [4] that was caused [5] by an act of torture,

12

extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Plaintiffs here seek money damages against Iran and MOIS. As explained above, both are considered to be a foreign state.[4] *Supra* III.A.1. And these damages are premised on plaintiffs' allegations of personal injury and death. Notably, the FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the basis of a claim for which money damages are sought. *Id.* In other words, defendants are not immune from suit from family members of Mr. Farhat and Mr. Jaber simply because those family members were not killed or maimed in the bombing. The *source* of their injuries is what is material. The family member plaintiffs' various emotional and financial injuries flow from the death of Mr. Farhat and the direct injuries suffered by Mr. Jaber. Thus, all plaintiffs have sought money damages against a foreign state for personal injury or death as required by the FSIA. Pls.' Suppl. Mot. at 9.

As to causation, as the Court has explained before, "there is no 'but-for' causation requirement" for claims made under the FSIA. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009) (Lamberth, J.). Instead, the causation element under the FSIA requires a showing of proximate cause. *See Owens v. Republic of Sudan*, 864 F.3d 751, 798 (D.C. Cir. 2017) ("Nothing in the FSIA, however, requires a greater showing of intent than proximate cause."), *certified question answered*, 194 A.3d 38 (D.C. 2018), *and vacated and*

---

[4] As this Court explained in *Worley v. Islamic Republic of Iran*, the MOIS "operated as the 'intelligence organization' of Iran at the time of the [Barracks bombing]." 75 F. Supp. 3d 311, 324 (D.D.C. 2014) (quoting *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003)). Since the FSIA defines "foreign state" to include "political subdivision[s] of a foreign state," 28 U.S.C. § 1603(a), the Court may treat the MOIS as a "foreign state" under the FSIA. *Worley*, 75 F. Supp. 3d at 324.

*remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). To show

proximate cause, plaintiffs must merely establish a "reasonable connection" between the behavior

of the defendant and the damage suffered by plaintiffs. *Id.* at 794. To establish that "reasonable

connection," plaintiffs must show that defendants' actions were "a substantial factor in the

sequence of events that led to [their] injury" and that plaintiffs' injuries were "reasonably

foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* (cleaned up).

Here, plaintiffs present evidence of many reasonable connections between the defendants'

behavior and the death and injuries of plaintiffs. Plaintiffs argue, mostly by reference, that the

Iranian government supported and facilitated the construction and deployment of the bomb, that

Iran ordered the attack and oversaw its operation, and that Iran financially supported Hezbollah.

*See* Pls.' Mot. 10 (predominantly arguing that "the issues pertaining to the Defendants' liability in

this matter are the same as those that were before the Court in *Peterson*."). Plaintiffs further argue

that the level of support and coordination Iran and MOIS provided was a substantial factor in the

sequence of events contributing to their injuries. *See id.* Death, injuries, and trauma are obviously

reasonably foreseeable results of a terrorist attack. Indeed, those are *goals* of a terrorist attack of

this sort. Thus, plaintiffs have sufficiently alleged causation.

Plaintiffs further allege that defendants committed torture, extrajudicial killing, and the

provision of material support and resources. Pls.' Mot. 2. More particularly, plaintiffs allege that

defendants provided "financial, operational, and technical support" to Iranian agents of Hezbollah

who constructed, deployed, and exploded the truck bomb, injuring and killing hundreds. *Id.* It is

immaterial that most plaintiffs in this case did not die in that attack. *See Salzman v. Islamic

Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019)

("The plain text of the statute requires that the claimed injury be '*caused by an act*

14

*of* . . . extrajudicial killing,' not that the injury be an extrajudicial killing itself." (citing with emphasis 28 U.S.C. § 1605A(a))). Plaintiffs have sufficiently alleged the commission of acts of torture and extrajudicial killing and the provision of material support and resources to that end by defendants.

Accordingly, because plaintiffs have sued a foreign state for acts of torture and extrajudicial killing and the provision of material resources for the same which caused personal injury and death for which money damages have been sought, the FSIA's terrorism exception is applicable, and defendants cannot evade accountability through sovereign immunity.

### 3.  Requirement For a Claim To Be Heard

A federal district court "shall hear a claim" under the FSIA's terrorism exception when certain conditions are met. 28 U.S.C. § 1605A(a)(2). Two conditions are relevant here: (i) that the foreign state was designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to the act and remains so designated; and:

> (ii) the claimant or the victim was, at the time the act . . . occurred—
> (I)     a national of the United States;
> (II)    a member of the armed forces; or
> (III)   otherwise an employee of the Government of the United States, or
>         of an individual performing a contract awarded by the United States
>         Government, acting within the scope of the employee's
>         employment.

*Id.* § 1605A(a)(2)(A)(ii). As the Court explains below, both requirements are met here.

The first criterion is easily met. The United States has long designated Iran as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836 (Jan. 23, 1984) (statement of Secretary of State George P. Schultz). Further, due to the persistent malevolence of Iran, the Department of State continues to designate Iran as a state sponsor of terrorism to this day. *See State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/F3KC-UPNK] (last visited

Feb. 20, 2024). Indeed, just a few weeks ago, the U.S. President condemned yet another attack carried out by Iran-backed militants.[5] Moreover, as the Court has explained many times before, the Secretary's initial designation was in partial response to the very same barracks bombing at issue here. *See, e.g.*, *Valore*, 700 F. Supp. 3d at 67. This designation meets § 1605A's definition of "state sponsor of terrorism." *See* 28 U.S.C. § 1605A(h)(6). Thus, the first condition for plaintiffs' claims to be heard is neatly met.

The second criterion is less clean-cut and raises issues at the heart of this case. Under the FSIA's terrorism exception, a district court is only required to hear claims when claimants or victims maintain at least one of four relationships with the United States: a claimant or victim must be (1) a U.S. national, (2) a member of the armed force, (3) an employee of the U.S. government, or (4) of an individual performing a contract awarded by the United States government. 28 U.S.C. § 1605A(a)(2)(A)(ii). The latter two categories contain the additional requirement that those claimants or victims be killed or injured while acting within the scope of their employment. 28 U.S.C. § 1605A(a)(2)(A)(ii).

The FSIA's terrorism exception does not define what constitutes "performing a contract awarded by the United States Government." *Id.* However, courts have understood that language to mean that individuals' claims must be heard if they are "contractors" for the U.S. government. *See, e.g.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1606 (2020) (explaining that 28 U.S.C. § 1605A(c) "is open to plaintiffs who are U.S. nationals, members of the Armed Forces, U.S. government employees or *contractors*, and their legal representatives") (emphasis added); *Lee v.*

---

[5] *See* Press Release, The White House, *Statement from President Joe Biden on Attack on U.S. Service Members in Northeastern Jordan Near the Syria Border* (Jan. 28, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/28/statement-from-president-joe-biden-on-attack-on-u-s-service-members-in-northeastern-jordan-near-the-syria-border/ [https://perma.cc/RST8-47L4] (mourning the loss of three American service members killed in an attack "carried out by radical Iran-backed militant groups").

*Islamic Republic of Iran*, 518 F. Supp. 3d 475, 490 (D.D.C. 2021) (Mehta, J.) (suggesting that the statute requires that "the victim must have been a national of the United States, a member of the armed forces, or an employee *or contractor* of the United States") (emphasis added). This interpretation is supported by the text: The term "performing a contract" is directly preceded by the term "employee," which is used in the disjunctive. *See 28* U.S.C. § 1605A(a)(2)(A)(ii). In this way, the statute evokes the traditional common law distinction between employees and independent contractors. Thus, the text of text of § 1605A(a)(2)(A)(ii) suggests that the statute refers to contractors. Accordingly, the Court interprets § 1605A(a)(2)(A)(ii) to require it to hear the claims of those performing as U.S. contractors.

Here, no claimants or victims are U.S. nationals or members of the armed forces. Indeed, all are Lebanese. Am. Compl. ¶ 11–18. However, plaintiffs allege that the Court must nonetheless hear their claims because the direct-victim plaintiffs, Mr. Farhat and Mr. Jaber, were "contract employees." Pls.' Mot. 5. Somewhat paradoxically, plaintiffs argue that the Mr. Farhat and Mr. Jaber were "contractors," but also "employees" of the U.S. Government, and that whatever employment relationship the direct-victims had was formed by virtue of an unwritten implicit contract.[6] Pls.' Mot. 5–6. Plaintiffs' jumbled employment argument will not wash, but the Court nonetheless holds that plaintiffs' claims must be heard because of the work the direct-victim plaintiffs did for the U.S. government.

---

[6] It is unclear whether the victim plaintiffs' can simultaneously be "employees" and "individuals performing a contract" under 28 U.S.C. § 1605A(a)(2)(A)(ii). *Compare Rogler v. Gallin*, 402 F. App'x 530, 531 (D.C. Cir. 2010) (unpublished) (noting that "[u]nder Title VII, one cannot be both an 'employee' and an 'independent contractor'"), *with Wright v. Off. of Wage Hour*, 301 A.3d 660, 678 (D.C. 2023) ("[W]e now agree with courts that have recognized that a worker may provide some labor as an employee while also providing different, additional labor as an independent contractor.") (surveying cases) (cleaned up). The Court need not decide that issue. Despite the imprecise language in the plaintiffs' motion, the Court is satisfied that each of the two direct-victim plaintiffs was either an employee of the U.S. government *or* performing a contract awarded by the U.S. government at the time of their death or injury.

### i. Mr. Farhat

Plaintiffs' claims stemming from Mr. Farhat's victim status must be heard because he was a contractor for the U.S. government when he was killed in the attack. Of course, in order to be contractor, one needs a contract. *See Contractor, Black's Law Dictionary* (10th ed. 2014) (defining contractor as "[a] party to a contract."); *Grace v. Magruder*, 148 F.2d 679, 682 (D.C. Cir. 1945) ("Even in the case of an independent contractor, there is an agreement or contract of some kind."). Plaintiffs do not provide evidence of a written contract, but the text of § 1605A(a)(2)(A)(ii) does not require one. Plaintiffs instead argue that Mr. Farhat's contract with the U.S. government was "implied-in-fact." *See* Pls.' Mot. 9. "An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973). Thus, implied-in-fact and express contracts have the same elements. *Goldings v. United States*, 98 Fed. Cl. 470, 479 (Fed. Cl. 2011) ("The elements of a binding contract with the United States are identical for express and implied-in-fact contracts."), *aff'd*, 451 F. App'x 953 (Fed. Cir. 2012). This means that to establish an implied-in-fact contract with the U.S. government, plaintiffs must be able to demonstrate "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Hoag v. United States*, 99 Fed. Cl. 246, 253 (Fed. Cl. 2011) (quotations omitted).

Mr. Farhat can demonstrate the existence of an implied-in-fact contract through his work at the barracks. Mr. Farhat worked at the building that eventually became the Marine barracks in the years before the Marines' arrival and thereby became familiar with the building and general

location. Pls.' Mot. 8. When the Marines arrived, he continued working there, helping others navigate the building and occasionally providing translation services and performing minor custodial or clerical work. *Id.*; Jacobs Aff. ¶ 7. Mr. Farhat was such a constant presence at the barracks that the Marines gave him the nickname "Shuffles," due to his unique gait from a hip or knee replacement. *Id.* ¶ 5. As a result of his work, he was considered a "part of [the] Marines family in Beirut and is remembered fondly." Jacobs Aff. ¶ 12.

The Court can infer from Mr. Farhat's presence and performance of occasional tasks at the barracks a mutual intent to contract. To be sure, plaintiffs present no evidence that Mr. Farhat was ever directly paid for those tasks.[7] However, that is no bar to contract formation. *Clay v. Chesapeake & Potomac Tel. Co.*, 184 F.2d 995, 996 (D.C. Cir. 1950) ("It is elementary contract law that neither money nor benefit moving to the promisor is essential to a contract."). Instead, in return for his work, Mr. Farhat was allowed to operate and profit from a small kiosk in the basement of the barracks, where he sold candy, soda, and cigarettes to Marines.[8] *Id.* ¶ 8. Mr. Farhat was also allowed to sleep in the building, a privilege not granted to other civilian visitors of the barracks. Jacobs Aff. ¶ 10–11.

The uncontroverted evidence suggests that Mr. Farhat's authorization to operate a kiosk and sleep in the barracks functioned as consideration for his assistance to the Marines. Pls.' Mot. 9. Accordingly, the Court is satisfied that Mr. Farhat received sufficient consideration to form an implied-in-fact contract with the U.S. government. Additionally, the Court has no reason to believe the Marines were not duly authorized to enter into an agreement with Mr. Farhat. Indeed, the

---

[7] Plaintiffs argue that the profits Mr. Farhat made from the kiosk he was permitted to operate constituted *indirect* payment by the Marines. Reed Aff. ¶ 11.

[8] This alone could be strong evidence that Mr. Farhat operated as a contractor. *See Browning-Ferris Indus. of California, Inc. v. Nat'l Lab. Rels. Bd.*, 911 F.3d 1195, 1214 (D.C. Cir. 2018) ("an important aspect of the independent-contractor inquiry is whether the workers in question are operating their own independent businesses.") (citing *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258–59 (1968)).

evidence suggests Mr. Farhat's work at the barracks was officially sanctioned by the appropriate authorities, as he was screened and given a card providing him with access to the Marines compound and the interior of the barracks. *See* Reed Aff. ¶ 11 ("Any civilian who was granted access to the compound would have undergone a screening process by vetting with U.S. Military Intelligence agencies and local friendly government contacts.").

Finally, the Court is satisfied that Mr. Farhat was killed while acting in the scope of his employment. Mr. Farhat was inside the barracks in the basement of the building—his place of work—when it was attacked on October 23, 1983, and he was killed instantly. *See* Mohamed Farhat Aff. ¶ 4, ECF No. 24-8 ("[M]y father . . . was at work at the Barracks and was killed in the explosion."). This is sufficient as any other evidence of Mr. Farhat's activities at the time of the attack was likely destroyed in the explosion. *See* Jacobs Aff. ¶ 13 (explaining that after the explosion, Mr. Farhat's body was "burned beyond recognition."); Mehdi Farhat Aff. ¶ 7, ECF No. 24-3 (suggesting that Mr. Farhat's "access card to the barracks was destroyed in the attack"). Thus, because the uncontroverted available evidence suggests that Mr. Farhat was "performing a contract awarded by the United States Government" and acting within the scope of his employment, 28 U.S.C. § 1605A(a)(2)(A)(ii), the Court is required to hear plaintiffs' claims based on his status as a victim.

### ii.   Mr. Jaber

Plaintiffs' claims stemming from Mr. Jaber's victim status must be also heard because he was acting as an employee of the U.S. government when he was injured by the attack at the barracks. Just as in the case of Mr. Farhat, plaintiffs argue that Mr. Jaber was a contractor who formed an implied-in-fact contract with the U.S. Government. *See* Pls.' Mot. 5–7. However, as explained below, the argument that Mr. Jaber was a contractor is less convincing. Mr. Jaber was a

Lieutenant Colonel in the Lebanese Army serving as Liaison Officer to the Commander of the U.S. MNF. *Id.* at 6. Among the several duties in that role were: assisting and advising the U.S. MNF Commander, making security recommendations, and solving problems that arose for the Marines—even if doing so put his own safety at risk. Hisham Jaber Aff. ¶¶ 4–5, ECF No. 24-2. Plaintiffs argue that these activities permit the Court to infer the existence of offer and acceptance, and perhaps that is true. Pls.' Mot. 5–6. However, the Court need not reach a conclusion on that issue because plaintiffs' motion lacks any evidence of consideration.

In its brief reference to any consideration received by Mr. Jaber, plaintiffs' motion posits that, in exchange for his services, Mr. Jaber received "access" to the Marines compound and was provided the "protection" of the U.S. government. Pls.' Mot. at 6–7. Plaintiffs provide no specific details on the scope of his access to the compound or what sort of protection, if any, he received. Nor do plaintiffs articulate how this access or protection *induced* Mr. Jaber into performing his duties or could otherwise constitute a "bargained-for" consideration. *Clay*, 184 F.2d at 996 ("The essence of consideration . . . is that it is a bargained-for equivalent.") (citing the Restatement (First) of Contracts § 75 (Am. L. Inst. 1958)). To the contrary, plaintiffs instead describe an instance of Mr. Jaber *providing* protection to Marines. *See* Hisham Jaber Aff. ¶ 6; Letter from U.S. MNF Commander Timothy Geraghty to Lebanese Army Commander General Ibrahim Tannous [hereinafter Geraghty Letter], ECF No. 24-2 (praising Mr. Jaber for his work—including one instance where he resolved a hostage situation involving two American military personnel).[9] In short, while consideration can be inferred from Mr. Farhat's unprecedented kiosk and sleeping

---

[9] Hisham Jaber's affidavit says this letter was written in 2003. Hisham Jaber Aff. ¶ 6. However, the letter itself is dated September 29, 1983, and references events occurring in the fall of 1983. ECF No. 24-2. Thus, the Court considers the reference to 2003 in the affidavit to be the result of a scrivener's error.

privileges, no such consideration can be inferred for Mr. Jaber. Thus, plaintiffs have failed to establish that Mr. Jaber had an implied-in-fact contractual agreement with the U.S. government.

Although the Court is unpersuaded by plaintiffs' arguments of an implied-in-fact contract between Mr. Jaber and the U.S. government, the Court is nonetheless satisfied that it must hear claims stemming from his victim status because he fits into the category of an employee under 28 U.S.C. § 1605A(a)(2)(A)(ii). That section does not define the word "employee," however it is well established that when a statute containing the term "employee" does not define it, the Court presumes that Congress meant to incorporate a common law agency understanding of the term—unless there is clear indication otherwise in the statute. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992). This is consistent with the understanding that "congressional silence often reflects an expectation that courts will look to the common law to fill gaps in statutory text, particularly when an undefined term has a settled meaning at common law." *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 447 (2003). With no clear indications to the contrary, this Court presumes that Congress intended the common law agency understanding of an "employee" to be applicable in § 1605A(a)(2)(A)(ii).

The Court looks to the ten factors in Section 220 of the Restatement (Second) of Agency to assess whether an individual is an employee at common law. *See Browning-Ferris Indus. of California*, 911 F.3d at 1213 (explaining in the context of the National Labor Reactions Act that "[t]his court too has relied specifically on Section 220 of the Restatement (Second) of Agency to determine whether a worker is an employee or independent contractor under traditional common-law principles"). Those factors include:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220 (Am. L. Inst. 1958). Of course, Mr. Jaber need not prevail on any individual factor to be considered an employee. Instead, the Court's assessment is one of the totality of circumstances. *See FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 496 (D.C. Cir. 2009). Traditionally, the central principle undergirding the relevant factors in this Section 220 was the degree of control the purported employer has over a purported employee. *See Clackamas*, 538 U.S. at 448 ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.").[10] However, more recently "entrepreneurial opportunity for gain or loss" has come to be considered "an important animating principle" by which to evaluate those factors. *FedEx Home Delivery*, 563 F.3d at 497. In any event, both Mr. Jaber's lack of control over his work and lack of entrepreneurial opportunities, as well as other relevant factors, suggest that he operated as an employee of the U.S. government in his work at the barracks.

As Liaison Officer to U.S. MNF, Mr. Jaber was under the control of the U.S. Marines, specifically Colonel Timothy Geraghty—Commander of the U.S. MNF. Pls.' Mot. 6–7. To be

---

[10] The Court acknowledges that an employee-independent-contractor analysis cannot be reduced to a simple formulation. *See, e.g.*, *United Ins. Co. of Am.*, 390 U.S. at 258 (explaining that to determine whether an individual is an employee or independent contractor "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive"). The Court does not suggest here that the right to control is the most important factor in any employee-contractor analysis. Instead, the Court's analysis today takes into consideration each of the applicable factors—including the right to control, which in this case overwhelmingly supports the conclusion that Mr. Jaber is an employee.

sure, Mr. Jaber was also a member of the Lebanese Army, and that is where he received payment from. *See* Reed Aff. ¶ 13 (noting that "liaison officers are paid by their respective military service"). Nonetheless, Mr. Jaber was formally assigned to the U.S. MNF Commander, reported to the Commander, and took commands from the Commander. Pls.' Mot. 6–7. Indeed, the Commander referred to him as "*my* liaison officer." Pls.' Mot. 7 (emphasis added). Mr. Jaber provided "invaluable services" directly related to the Marines' mission in Beirut, Reed Aff. ¶ 13, and did so consistently for several months prior to the attack. *See* Geraghty Letter. The close connection of Mr. Jaber with the U.S. Commander is most evident from a letter the U.S. Commander wrote to the Lebanese Army Commander where he said that Mr. Jaber's excellent work for the U.S. placed him "forever in his debt." Geraghty Letter. In short, Mr. Jaber's "total employment duties involved serving the needs of the U.S. Commander." *See* Reed Aff. ¶ 13.

It is no obstacle to this Court's analysis if Mr. Jaber was simultaneously an employee of the Lebanese Army. Indeed, the common-law understanding of "employee" permits an individual to have more than one employer. *See* Restatement (Second) of Agency § 220 (Am. L. Inst. 1958) ("A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other."). Plaintiffs' uncontroverted evidence suggests Mr. Jaber had an employee relationship with the U.S. government irrespective of his relationship with the Lebanese Army. *See* Reed Aff. ¶ 1 ("In the performance of [liaison officer] duties, they act as agents (employees) of the U.S. Commander."). Thus, even though Mr. Jaber was simultaneously a Lieutenant Colonel in the Lebanese Army, "[t]he relationship between the U.S. Commander and Hisham Jaber was a mutual employment services connection." *See* Reed Aff. ¶ 13.

Further, unlike Mr. Farhat, Mr. Jaber was not permitted to profit and operate from a side business at the barracks. *See supra* III.A.3.i; *Lancaster Symphony Orchestra v. Nat'l Lab. Rels. Bd.*, 822 F.3d 563, 570 (D.C. Cir. 2016) (explaining how entrepreneurial opportunity provides support for independent contractor status). As a result, Mr. Jaber lacked any entrepreneurial opportunity for profit or loss that might suggest that he would be better characterized as an independent contractor. Thus, the Court finds that he was an employee for the purpose of § 1605A(a)(2)(A)(ii).[11]

Finally, Mr. Jaber was operating within the scope of his employment at the time of his injury. Among Mr. Jaber's responsibilities was serving the needs of the U.S. Commander and generally helping to solve problems for the Marines as they arose. The search and rescue effort in the aftermath of the bombing was certainly necessary, and the fallout from the attack presented serious problems that Mr. Jaber assisted with solving. Without individuals like Mr. Jaber helping in the search and rescue operation, the attack's casualties and injuries could have been even more severe. Although Mr. Jaber was not present at the exact moment of the explosion, his injuries are a direct result of the work he did after it. Thus, the Court must hear the claims of Mr. Jaber.[12]

### iii.  Family Member Claims

Although they were not direct victims of the attack, the Court must hear the claims of Mr. Farhat and Mr. Jaber's family members as well. This Court has previously explained that 28 U.S.C. § 1605A(a)(2) includes the claims of foreign family members who base their claims on injuries

---

[11] The Court will resist the temptation to spill additional ink on precisely where Mr. Farhat and Mr. Jaber fall on the employee-independent contractor spectrum. To assess the Court's jurisdiction, it is sufficient to determine that, at the very least, the uncontroverted evidence suggests that work they did for the U.S. permits their claims to be heard.

[12] Critically, the Court confines its determination of the employment and contractual status of the direct-victim plaintiffs to this case—and this case alone. This is a highly fact-specific inquiry. The Court offers no general conclusions as to the employment status of Mr. Farhat and Mr. Jaber under any other statutes, nor does it offer opinion on the employment status of any future foreign plaintiffs.

suffered by victims who meet the requirements of the statute. *Worley*, 75 F. Supp. 3d at 327. Here, the family member plaintiffs—spouses and children of Mr. Farhat and Mr. Jaber—have submitted uncontroverted affidavit evidence detailing their relationships to the victims and the injuries they suffered.[13] Each of those injuries arise out of the death of Mr. Farhat or the injuries to Mr. Jaber. Thus, the family member plaintiffs have met both requirements of § 1605A(a)(2). This Court must hear their claims.

\* \* \*

The Court has determined that it has original jurisdiction, that Iran and MOIS are not entitled to sovereign immunity, and that it is required to hear the claims of each of the plaintiffs. Thus, the Court has subject matter jurisdiction.

## B. Personal Jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has original jurisdiction pursuant to § 1330(a), and (2) plaintiffs properly effectuate service under § 1608 of the FSIA. *See* 28 U.S.C. § 1330(b). As explained above, § 1330(a)'s requirements for original jurisdiction are met here. *Supra* III.F.1. The remaining issue is whether plaintiffs adhered to the procedural requirements for service of process in § 1608.

The FSIA prescribes four valid methods of service, listed in order of preference. *Worley*, 75 F. Supp. 3d at 327. If a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available. *Id.* First, a plaintiff should follow "any special arrangement[s]" for service—e.g., a contractual provision—between the plaintiff and the foreign state. 28 U.S.C.

---

[13] Ahmad Farhat Aff., ECF No. 28-3 at 1–2; Hassan Khalil Farhat Aff., ECF No. 28-3 at 3–4; Issam Khalil Farhat Aff., ECF No. 28-3 at 5–6; Hussein Khalil Farhat Aff., ECF No. 28-3 at 7–8; Hanan Mostapha Hijazi for the Estate of Ibrahim Khalil Farhat Aff., ECF No. 28-3 at 9–10; Souhaila Khalil Farhat Aff., ECF No. 28-3 at 11–12.; Mehdi Khalil Farhat Aff., ECF No. 28-3 at 13–14. Karima Khalil Farhat Aff., ECF No. 28-3 at 15–16; Nada Khalil Farhat Aff., ECF No. 28-3 at 17–18; Mehdi Khalil Farhat for the Estate of Zeina Mortada Mantach, ECF No. 28-3 at 19–20; Dana Jaber Khatoun, Aff., ECF No. 28-3 at 39–41; Nada Al Husseini Jaber Aff. ECF No. 31-1.

§ 1608(a)(1). Second, a plaintiff may serve the defendant state "in accordance with an applicable international convention" on service of process. *Id.* § 1608(a)(2). No such special arrangement or international convention is applicable here, so neither of the first two options were available. *Cf. Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

As a result, on June 4, 2020, plaintiffs attempted service on Iran and MOIS under the third option, § 1608(a)(3), which required mailing the requisite documents to Iran and the MOIS. *See* ECF Nos. 9, 10, 13; 28 U.S.C. § 1608(a)(3) (permitting service by serving copies of the complaint, summons, and notice of suit on a defendant state's "head of the ministry of foreign affairs"). When that failed, plaintiffs resorted to the fourth and final service method in § 1608(a) by requesting to serve Iran through diplomatic channels, as permitted by § 1608(a)(4). *See* ECF No. 16. The Clerk of the Court mailed these documents on September 24, 2020. ECF No. 17. And according to the Department of State, these documents were served on December 22, 2020, under cover of diplomatic note. ECF No. 18 at 1. Reviewing these filings, the Court concludes that plaintiffs have complied with § 1608(a)(4) and have properly served Iran and the MOIS in accordance with the FSIA. Thus, the Court may exercise personal jurisdiction over the parties.

### C. Time Limitations

Time limitations do not preclude the Court from assessing defendants' liability here. Actions under § 1605A "may be brought or maintained" only if filed "not later than" (1) "10 years after April 24, 1996," or (2) "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b). Further, when plaintiffs add new plaintiffs in an amended complaint—as was the case here—the Court assesses the timeliness of those new plaintiffs' claims pursuant to Rule 15(c) of the Federal Rules of Civil Procedure. However, the Court need not calculate the tardiness of any plaintiffs in this case. Limitations under the FSIA's terrorism exception have long been treated as

affirmative defenses that may be waived if not timely asserted by a defendant. *See Worley*, 75 F. Supp. 3d at 328–31. Put another way, those limitations are not jurisdictional. *See id.* Even if this Court were inclined to enforce time limitations *sua sponte*—which it is not—it has no authority to do so. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) ("We conclude that no such authority exists for a federal court to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant."). If Iran appeared in this case, it may have been able to present its objections to suit on limitation grounds, but because Iran chose to ignore these plaintiffs—and, therefore, has not raised such a defense—the Court will not enforce one.

### D. Estate-Plaintiff Standing

Four of the fifteen plaintiffs in this action are estates.[14] One of these plaintiffs—the Estate of Khalil Farhat—brings a right of action related to the decedent's death. The other estate plaintiffs—the Estate of Zeinda Mortada Mantach (Khalil's widow), the Estate of Ibrahim Farhat (Khalil's son), and the Estate of Mohamed Farhat (Khalil's son)—instead seek recovery for emotional and mental anguish that the decedents suffered while still alive. *See* Am. Compl. ¶¶ 12–15. The Court must evaluate whether those estate plaintiffs who bring claims for injuries suffered during the decedent's life have standing. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) ("These [estate] plaintiffs must establish their standing before they may recover for harms suffered during the decedent's lives."); *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs"). Whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question that is "governed by the law of the state

---

[14] Two plaintiffs were estates at the outset of litigation. Estate of Khalil Farhat, Am. Compl. ¶ 11; Estate of Ibrahim Khalil Farhat, Compl. ¶ 15. Two plaintiffs died during the pendency of litigation and were substituted for their estates. *See* Order, ECF No. 32, (granting motion to substitute Estate of Zeina Mortada Mantach and Estate of Mohamed Farhat for plaintiffs who died during the pendency of litigation).

which also governs the creation of the estate." *Worley*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) (quoting *Taylor*, 811 F. Supp. 2d at 12).

Plaintiffs have presented no evidence or argument regarding which state's laws govern this question.[15] The Court will not guess. Nor will it further delay the resolution of this motion by once again ordering plaintiffs to produce evidence of applicable state law. *See* Order, ECF No. 25. Instead, the Court will refer the matter to the special master appointed by the Order accompanying this Memorandum Opinion. The special master shall take evidence regarding which state laws govern this issue as to the three estate plaintiffs bringing claims for harm suffered during the decedents' lives. If, based on this evidence, the Court determines that applicable state laws preclude any estate plaintiff from recovering, the Court shall dismiss that plaintiff. Going forward, the Court urges all FSIA plaintiffs to ensure that their motions for default include evidence and argument as to any applicable state law. FSIA counsel represent sympathetic clients who are often deserving of relief in light of the atrocities they have endured: But they must still come with evidence.

### E. Liability

The Court now turns to the defendants' liability. To bring their claims, plaintiffs must have a private right of action. The FSIA's state-sponsored terrorism exception provides one such private right of action. 28 U.S.C. § 1605A(c). However, actions under that exception are only available to (1) U.S. nationals, (2) members of the armed forces, (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government,

---

[15] Plaintiffs assert that the creation of Ibrahim Farhat's estate is governed by Lebanese law but provide no evidence or rationale as to *why* Lebanese law is applicable. *See* Pls.' Suppl Mot. 3. Instead, plaintiffs leap that analytical hurdle and argue that Lebanese law permits estate standing. *Id.*; *See* Affidavit Relating to Issues Arising Under Lebanese Law, ECF No. 28-2. Further, plaintiffs have not acknowledged that they must establish standing for other estate plaintiffs.

acting within the scope of the employee's employment, and (4) the legal representative of the any of the above-mentioned groups. § 1605A(c). The Estate of Mr. Farhat, through its legal representative, has a private right of action under the terrorism exception because, as explained, Mr. Farhat was performing a contract awarded by the U.S. government at the time he was killed. *See supra* III.A.3.i. Similarly, Mr. Jaber has a private right of action under the terrorism exception because he was an acting as an employee of the U.S. government when he was injured. *See supra* III.A.3.ii. The family members plaintiffs, however, do not fit into any of the § 1605A(c) categories. At this step, the family member plaintiffs cannot use the terrorism exception's private right of action simply because their claims flow from Mr. Jaber and Mr. Farhat's injury and death. Tailgating direct victims—while sufficient to confer jurisdiction—does not bestow a private right of action. In this way, the scope of the terrorism exception's private right of action is narrower than its grant of jurisdiction. *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 87 (D.D.C. 2018) (Moss, J.) (recognizing that the federal cause of action is "more restrictive"). The family member plaintiffs are therefore ineligible under § 1605A(c) and lack a federal cause of action. However, they may still pursue claims under applicable state or foreign law. *Est. of Doe*, 808 F. Supp. 2d at 20. Thus, the Court will first assess that liability of Iran and MOIS to the direct-victim plaintiffs under the FSIA's private right of action. Then it will assess the defendants' liability to the family member plaintiffs under applicable law.

### 1. FSIA Liability

Defendants are liable under the FSIA's private right of action for state sponsors of terrorism. 28 U.S.C. § 1605A(c). The Court's—otherwise straightforward—liability analysis first requires an explanation of a recent shift in views on the requirements of this statutory provision.

Liability under the FISA's terrorism exception can be boiled down to five elements. Under FSIA's terrorism exception, foreign states are liable for: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused (4) personal injury or death (5) "for which courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A(a)(1), (c).

The traditional view was that "as a general matter it is not enough that FSIA plaintiff simply lay out the five elements of liability under the state-sponsored terrorism exception." *Rimkus*, 750 F. Supp. 2d at 175. This view was based on the understanding that "[s]ection 1605A(c) does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *24 (D.D.C. Aug. 15, 2023). Instead, to satisfy the causation and "personal injury or death" requirements of § 1605A(c)—elements three and four—a plaintiffs must "articulate the justification for such recovery, generally through the lens of civil tort liability." *Rimkus*, 750 F. Supp. 2d at 176. In other words, plaintiffs were required to "prove a theory of liability under which defendants cause the requisite injury or death." *Valore*, 700 F. Supp. 2d at 73.

In assessing a plaintiffs' theories under the traditional view, courts look to existing law. *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (Lamberth, J.) ("[B]ecause the FSIA instructs that 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances,' 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.") (quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003)). To find that law, courts look to "sources such as state

decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law." *Est. of Heiser*, 659 F. Supp. at 24 (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability).

Recently however, some courts in this District have begun to take a swifter course. This is due to the similarity between two of the terrorism exception's provisions: § 1605A(a)(1), its immunity-stripping provision, and § 1605A(c), its liability provision. In pertinent part, the immunity-stripping provision—which provides a court with jurisdiction—states that foreign states are not immune from suits seeking money damages for:

> personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1); *supra* III.A.2. Similarly, the liability provision declares that foreign states are liable to eligible individuals for:

> personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c). Over time, the textual overlap of § 1605A(a)(1) and § 1605A(c) inspired courts to collapse the inquiries of jurisdiction and liability into one. Under this new view, § 1605A(c) creates a cause of action for the same conduct that gives rise to jurisdiction under the terrorism exception. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (Kollar-Kotelly, J.). In other words, once the court has determined subject matter jurisdiction, liability under the FSIA's terrorism exception is conclusively established for eligible plaintiffs.

*Salzman v. Islamic Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *15 (D.D.C. Sept. 25, 2019) ("There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law.") (cleaned up) (quoting *Foley*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Allan v. Islamic Repub. of Iran*, No. 17-cv-338 (RJL), 2019 WL 2185037, at *6 (D.D.C. May 21, 2019) ("[M]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605A(c).''). On this view, assessing liability under the FSIA's terrorism exception is elementary: If there is jurisdiction, then there must be liability for eligible plaintiffs.

The Court is somewhat ambivalent as to whether this jurisdiction-begets-liability regime is prudent. On one hand, there is some reason to believe that a unique liability analysis is a better course as "the question [of] whether a statute withdraws sovereign immunity is 'analytically distinct' from whether a plaintiff has a cause of action." *Owens*, 864 F.3d at 807 (first citing *FDIC v. Meyer*, 510 U.S. 471, 484 (1994); then citing *United States v. Mitchell*, 463 U.S. 206, 218, (1983))). On the other hand, it is challenging to identify what text in the terrorism exception makes these two analyses distinct. The causation and "personal injury or death," language in the statute's liability provision—which has been construed to require a civil tort theory—is also present in the immunity-stripping provision. In light of this textual symmetry, the Court is hesitant to impose additional burdens on FSIA plaintiffs who already "face several hurdles" to obtain relief. *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-1182 (RCL), 2023 WL 7112801, at *8 (D.D.C. Oct.

27, 2023). In any event, the Court need not decide that question to resolve plaintiffs' motion. These plaintiffs' claims would survive either view.

To start, plaintiffs have satisfied each of the five elements of § 1605A(c). *See supra* III.A.2. Under the more recent view, the Court need not expound further on defendants' liability to the Estate of Mr. Farhat and Mr. Jaber. Iran and MOIS's liability to them has already been established by the Court's conclusions on jurisdiction set forth above. Under the traditional view however, plaintiffs' complaint must also set forth some common law theory of recovery. It does not—at least not explicitly. This Court has previously "urge[d] future plaintiffs in all § 1605A actions . . . to clearly articulate the theories of recovery in future actions." *Rimkus*, 750 F. Supp. 2d at 176. However, even under the more onerous traditional standard, the Court would not "exalt form over substance to dismiss plaintiff's action." *Id.*

At bottom, the Estate of Mr. Farhat's claims in this case are for recovery of damages under the FSIA for his murder in the barracks bombing, and Mr. Jaber's claims are for his injuries sustained in the immediate aftermath of the bombing. *See* Am. Compl. ¶¶ 11, 16. Such allegations state valid causes of action. *Rimkus*, 750 F. Supp. 2d at 176 ("The fact that plaintiff does not expressly set forth a prototypical common law cause of action will therefore not defeat his claim for relief."). In light of the many previous cases arising from this attack, "the Court need not dig too deep to locate an obvious theory of recovery here." *Id.* at 183–84.

As to Mr. Farhat, wrongful death provides one such theory. Plaintiffs' Amended Complaint, while not explicitly articulating a theory of wrongful death, does acknowledge wrongful death as a tort available under § 1605A(c). *See* Am. Compl. ¶ 8. Further, in prior cases arising from the same attack on the Marine barracks, the Court has held that servicemembers—whom Mr. Farhat died alongside—could establish wrongful death theories of

recovery against defendants. *See Worley*, 75 F. Supp. 3d at 335. Under this theory, decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) "for economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted). Where defendants are liable for a decedent's extrajudicial killing, as is the case here, defendants may be held "liable for the economic damages caused to decedents' estates." *Id.* Thus, Mr. Farhat can sufficiently prove the validity of a wrongful death theory of recovery against defendants.

As to Mr. Jaber, intentional infliction of emotional distress ("IIED") provides a theory of recovery. Plaintiffs' third count in the Amended Complaint is for intentional infliction of emotional distress, but it is unclear whether they cabin that claim to family members of the direct-victim plaintiffs. Am. Compl. ¶ 49. In prior cases, however, survivors of the Beirut bombing have also alleged IIED as a theory of liability. *Valore*, 700 F. Supp. 2d at 76–77.[16] That theory is also applicable here: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1) (Am. L. Inst. 1965). Naturally, plaintiffs are not hard pressed to demonstrate "extreme and outrageous conduct" or "severe emotional distress" in the case of terrorism. *See Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.") (citing

---

[16] Survivors in *Valore* and other cases also alleged theories of assault and battery, which could be similarly applicable here. *Valore*, 700 F. Supp. 2d at 76. However, the Court need not assess those theories at this time as they are not pled, and in any event, plaintiffs may only recover under one theory. *See, e.g., EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'") (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)); *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues.").

*Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Here, Mr. Jaber's uncontroverted assertions suggest that he did, in fact, suffer severe emotional and bodily harm. Hisham Jaber Aff. ¶¶ 10–11 (describing his injuries: "eye problems due to prolonged exposure to dust and smoke during the search and recovery process" which necessitated multiple surgeries, "extraordinary grief, mental anguish, and emotional distress,"). Thus, applying general IIED tort law principles in the FSIA context, the Court concludes that Mr. Jaber can sufficiently establish defendants' liability.

In sum, Mr. Farhat and Mr. Jaber bring their federal causes of action for death and injury caused by an unspeakable act of terror at the hands of defendants. On these facts, the Court has no trouble concluding that Iran and MOIS are liable to them under the FSIA's terrorism exception.

### 2. Non-FSIA Liability

Defendants are liable to the family member plaintiffs as well. Because the family member plaintiffs have no federal cause of action, the Court must evaluate their claims under applicable state or foreign law. *See Est. of Doe*, 808 F. Supp. 2d at 18–20. Before it can do so, the Court must answer the antecedent question of which jurisdiction's law should apply. There are two conceivable choices: (1) the laws of Lebanon, where the incident occurred, and (2) the laws of the District of Columbia, the forum. For the reasons outlined below, the Court holds that the laws of the District of Columbia are applicable to the family member plaintiffs' claims.

The Court begins its choice of law analysis by choosing how to choose. Federal courts addressing FSIA claims in the District of Columbia apply the choice of law rules of the forum state. *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009); *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224 (JDB), 2005 WL 756090, at *18 (D.D.C. Mar. 29, 2005). Thus, in this case, the Court looks to the choice of law rules of the District of Columbia. Those

36

rules first require a court to assess whether there is a conflict between the laws of the forum state and an alternative jurisdiction. *Est. of Doe*, 808 F. Supp. 2d at 20. In the absence of a true conflict, a court applies the law of the forum state. *Id.* In the event a conflict exists, a court will blend a "governmental interests analysis" with a "most significant relationship" test to determine which law should apply. *Oveissi*, 573 F.3d at 842 (quoting *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n. 18 (D.C. 1989). In *Oveissi*, the D.C. Circuit outlined the details of that multivariate analysis:

> "Under the governmental interests analysis[,] ... [a court] must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules*, 566 A.2d at 41 (internal quotation marks omitted). To determine which jurisdiction has the most significant relationship to a case, a court must "consider the factors enumerated in the Restatement [(Second) of Conflict of Laws] § 145." *Id.* at 40. The four Restatement factors are: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered.".

*Oveissi*, 573 F.3d at 842 (D.C. Cir. 2009) (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971).

The Court need not undertake that analysis because there is no conflict between the laws of Lebanon and the laws of the District of Columbia here. Family member plaintiffs bring claims for loss of solatium and intentional infliction of emotional distress. *See* Am. Compl. ¶¶ 43, 49. As determined in *Doe*, "District of Columbia law parallels Lebanese law regarding the availability of a claim for emotional distress, solatium, and/or consortium related to the wrongful death or tortious injury of an immediate relative." *Est. of Doe*, 808 F. Supp. 2d at 21. Further, the Court has conducted a review of the plaintiffs' attached affidavit on Lebanese law, which supports this

holding.[17] Thus, the Court sees no reason to deviate from the view that, in cases like this one, there is no conflict between the laws of Lebanon and the District of Columbia as to liability. Having established that the laws of the District of Columbia will apply, the Court now assess the liability of defendants under those laws.

The family member plaintiffs bring claims for IIED and loss of solatium. *See* Am. Compl. ¶¶ 43, 49. However, "'solatium[ ] . . . is not an independent cause of action, but rather is a form of damages' that is available to IIED claimants." *Maalouf v. Islamic Republic of Iran*, 514 F. Supp. 3d 280, 287 (D.D.C. 2021) (quoting *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 67–68 (D.D.C. 2006)). So the Court will apply the standards for IIED to assess defendants' liability to the family member plaintiffs. *See Valore*, 700 F. Supp. 2d at 85 (citing *Heiser II*, 659 F. Supp. 2d at 27 n.4). In the District of Columbia, the elements of IIED track the Restatement: "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (quoting Restatement (Second) of Torts § 46 (1965)). Thus, the IIED analysis the Court conducted above as to Mr. Jaber is also applicable for the family member plaintiffs. *See Supra* III.E.1. However, the family members' claims are distinct from Mr. Jaber's theory of relief in one key respect: the family members were not directly physically injured by the attack.

When claimants were not the direct recipient of the "extreme and outrageous conduct," the Restatement nonetheless permits recovery if (1) they are members of a victim's immediate family and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Heiser II*,

---

[17] Plaintiffs have attached to their second motion for default judgment an affidavit from René Abirached analyzing relevant provisions of Lebanese law. *See* Affidavit Relating to Issues Arising Under Lebanese Law, ECF No. 28-2.

659 F. Supp. 2d at 26–27 (quoting Dan B. Dobbs, The Law of Torts § 307, at 834 (2000)); *see also* Restatement (Second) of Torts § 46, cmt. 1 (leaving "open the possibility of situations in which presence at the time may not be required"). This Court strictly construes the "immediate family" requirement in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)). Not so for the presence requirement. An individual "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore,* 700 F. Supp. 2d at 80. This is because terrorism is so extreme and outrageous that it is often intended to inflict severe emotional harm even on those who were not present at the site of the act. *Id.*

Here, defendants' conduct was extreme, outrageous, and intended to cause emotional distress. The family member plaintiffs have submitted uncontroverted affidavits outlining the severe distress and psychological trauma they suffered as a consequence of defendants' actions. *Supra* III.A.3.iii. Thus, under the laws of the District of Columbia, Iran and MOIS are liable to the family member plaintiffs for IIED.

### F. Punitive Damages

In the fourth count of their Amended Complaint, plaintiffs seek punitive damages. Am. Compl. ¶¶ 51–54. Of course, punitive damages are not an independent cause of action. *See Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 25 (D.D.C. 2009). Instead, punitive damages could be an appropriate *remedy* for their plaintiffs' other claims. *Cf. Rimkus*, 750 F. Supp. 2d at 175–76 (allowing a "claim" for punitive damages to proceed because it was supported by sufficiently specific allegations of a cause of action under section 1605A). Thus, the Court will treat plaintiffs' punitive damages count as, in effect, a request for punitive damages as a remedy for their legitimate

claims against defendants. *See Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (treating a claim for punitive damages as "part of an ad damnum clause"). The Court will consider the proper measure of punitive damages, if any, at the time it considers the special master's recommendations regarding compensatory damages.

## IV.   SPECIAL MASTER

While the Court today makes factual findings and legal conclusions regarding defendants' liability, it does not have sufficient evidence before it to determine damages. Plaintiffs have accordingly requested this Court "appoint a special master or magistrate to determine an appropriate damages award for each Plaintiff." Pls.' Mot. 11. This is within the Court's authority as § 1605A authorizes federal courts to "appoint special masters to hear damage claims brought under this section." 28 U.S.C. § 1605A(e)(1). Here, appointment of a special master would not impose undue expenses on any party and will not result in unreasonable delay—a prerequisite set forth in Fed. R. Civ. P. 53(a)(3). Thus, the Court will appoint a special master to take evidence and file a report and recommendation as to the amount of individual damages for which defendants may be liable to each plaintiff.

The Court has learned that Alan L. Balaran is willing to serve as a special master. Thus, the Court will refer this matter to Special Master Balaran for the taking of evidence on and recommendation of findings on the measure of compensatory damages warranted for each plaintiff and such other matters specified in the Order accompanying this Memorandum Opinion.

## V.   CONCLUSION

More than four decades ago, a suicide bomber, operating under the auspices of the Iranian government, detonated at the Marine barracks building in Beirut, Lebanon. That act of cowardice killed and injured hundreds. Victims of that attack included not only U.S. nationals and servicemen, but also foreign nationals working for our government in pursuit of peace in the region. As victims continue to emerge from the wreckage, the Court will continue to examine their right to relief under the FSIA's terrorism exception. Judgments under § 1605A cannot alone solve the issue of state-sponsored terror, but they can begin to provide compensation to those most impacted by it.

For the reasons set forth above, plaintiffs' motion for default judgment and for judicial notice is **GRANTED**.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: February 21, 2024

Royce C. Lamberth
United States District Judge